165 N.J. Super. 531 (1979)
398 A.2d 908
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
REGINALD BOWMAN, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted December 18, 1978.
Decided January 30, 1979.
*532 Before Judges CONFORD, PRESSLER and KING.
Mr. Stanley C. VanNess, Public Defender of New Jersey, attorney for appellant (Ms. Kathryn A. Brock, Assistant Deputy Public Defender, on the brief).
*533 Mr. John J. Degnan, Attorney General of New Jersey, attorney for respondent (Mr. Donald S. Coburn, Essex County Prosecutor, of counsel; Mr. Kenneth Ply, Assistant Prosecutor, on the brief).
The opinion of the court was delivered by KING, J.A.D.
Defendant was convicted of murder in the first degree and sentenced to life imprisonment. He appeals, alleging multiple trial errors. There are two circumstances requiring reversal: (1) the prosecutor's statement to the jury on summation that the trial judge had previously found the defendant's two "confessions" to be voluntary; and (2) the trial judge's failure to clearly instruct the jury on the elements of larceny, as distinguished from robbery, because of the pertinence of this distinction to the felony-murder charge.
On the morning of May 31, 1975 Clarence McGrady was found murdered in his Newark home where he lived alone. An autopsy revealed that he had been dead for at least 48 hours from a gunshot wound to the head. In a pocket which appeared to have been untouched $200 in cash was found. Other pockets of the victim's clothing had been turned inside out.
Several days after the murder the victim's daughter, Mrs. Wesley, and the police unlocked the safe in the basement of McGrady's house and found $500 and a list of names of the Bowman family, of which defendant was a member. The Bowmans were relatives of Dorothy McGrady, the victim's wife, who had died the year before. Defendant's name and address was listed; he was described as a brother of the victim's deceased wife.
In July Mrs. Wesley received financial statements and receipts for Carte Blanche and American Express cards held by her father. The Carte Blanche statement showed a May 29 purchase at the Victoria Camera and Radio Shop in New York City. The signature on the receipt was not her father's. A receipt for a purchase at a New York men's *534 store, Phil Cromfeld's, on May 28 also did not contain her father's authentic signature.
On July 31 defendant was arrested on other charges and was held at Newark police headquarters. Detective McKinley Jackson, in charge of the McGrady homicide investigation, interrogated defendant about the killing and defendant was given a polygraph examination. Thereafter defendant gave a written statement to the police at about 9 P.M. that evening. In this statement defendant admitted being at the victim's house at the time of the murder with a Larry Jones and a man named "Sam". He said the three were admitted voluntarily by the victim. Defendant said that while the others were talking he went upstairs alone to use the bathroom. While there he stole two credit cards from the bedroom. As he was looking around for money defendant said he heard shots, ran downstairs and saw McGrady lying on the floor. Jones, "Sam" and defendant then fled. Defendant admitted using the victim's American Express credit card to purchase a suit at Phil Cromfeld's in New York. He denied using the Carte Blanche card.
The next day defendant gave the police another statement detailing an entirely different story. Defendant said he lied about the presence of the two other men. He stated that he shot McGrady himself with the victim's own gun while they argued in the kitchen about a business deal. Defendant claimed McGrady pulled the gun on him and defendant grabbed it away. Defendant said that as McGrady tried to grab the gun back, he accidentally shot the victim in the head. Defendant denied rummaging through McGrady's house and made no mention of stealing credit cards. After the shooting defendant left, throwing the gun away nearby.
On voir dire defendant claimed the statements were obtained by beatings and threats of additional violence, and without Miranda warnings. He admitted that the police recovered the suit purchased with the stolen credit card from his apartment. The trial judge ruled in the State's favor on the voluntariness of the "confessions" and on the Miranda *535 issues. At trial defendant offered no proof and did not testify.

I
Defendant contends that the trial judge erred in denying his motion for mistrial during the prosecutor's summation. During closing argument the prosecutor told the jury that the trial judge had already ruled that defendant's two statements to the police were voluntary. The prosecutor said:
The case is here not to discuss the voluntariness of any of the statements because that's up to the Judge, Judge Feinberg, and he has ruled these were voluntary. It is up to you to determine if any part of this statement is truthful.
Defense counsel immediately asked to be heard at side bar and was told by the court: "As soon as he [the prosecutor] is finished. Go ahead."
At the conclusion of the State's summation defendant moved for a mistrial on the grounds that the prosecutor's conduct violated the Supreme Court's mandate in State v. Hampton, 61 N.J. 250 (1972). The trial judge denied the motion because of insufficient prejudice, saying he would instruct the jury correctly during his final charge. The judge thereafter did give the standard instruction to the jury, i.e., that it was their function to determine whether the statements were actually made and were credible in whole or in part. Although the instruction on the jurors' function in considering the evidential value of defendant's statements was literally correct, it did not attempt to cure the prosecutor's impropriety. They were not told to disregard the prosecutor's remark, or that it was improper.
In State v. Hampton, supra, 61 N.J. at 270-272, our Supreme Court declared that the trial judge must decide whether the Miranda requirements have been satisfied and whether defendant's statement is voluntary within the meaning of the Fifth and Fourteenth Amendments to the *536 Federal Constitution. Thereafter the jury's duty is to weigh all relevant facts and determine the credibility of the statement. The Supreme Court stated in Hampton:
* * * we hold for the future that the trial court alone shall determine (1) whether the Miranda warnings were given to the accused and his rights thereunder waived by him before the confession was given; and that if it finds the warnings were not given, or if given the right not waived, the confession must be excluded, and (2) if those conditions were satisfied, whether in light of all the circumstances attending the confession it was given voluntarily. If these questions are resolved in favor of the State, then, without being advised of the court's decision, the jury shall be instructed that they should decide whether in view of all the same circumstances the defendant's confession is true. If they find that it is not true, then they must treat it as inadmissible and disregard it for purposes of discharging their function as fact finders on the ultimate issue of guilt or innocence.

[at 272; emphasis added]
See, also, this requirement as prescribed by Evid. R. 8(3), "Preliminary Inquiry by Judge," as amended effective July 1, 1976, which states:
Where by virtue of any rule of law a judge is required in a criminal action to make a preliminary determination as to the admissibility of a statement by the defendant, the judge shall hear and determine the question of its admissibility out of the presence of the jury. In such a hearing the rules of evidence shall apply and the burden of proof as to admissibility of the statement is on the prosecution. If the judge admits the statement he shall not inform the jury that he has made a finding that the statement is admissible, and he shall instruct the jury that they are to disregard the statement if they find that it is not credible. If the judge subsequently determines from all of the evidence that the statement is not admissible, he shall take appropriate action.
Thus the prosecutor's conduct violated the Supreme Court's directive stated in both the case law and the Rules of Evidence. Defendant contends that the prosecutor's allusion to the judge's ruling on voluntariness had the clear capacity to influence the jury's determination as to the credibility of his "confessions." He asserts that the very reason for the *537 mandate in Hampton and the directive in the Rules of Evidence is to insure to a defendant an unfettered factual consideration by the jury of the credibility of all or part of his "confessions."
The State contends that the error was harmless, even though it went essentially uncorrected, because defendant did not testify and introduced no evidence before the jury that the "confessions" were indeed coerced and involuntary. We do not perceive the error to be harmless in the context of this case. The two "confessions" were crucial to the State's case. They were inconsistent, if not contradictory. They bore critically not only on the guilt or innocence of the defendant, but on the degree of his guilt as well. Under these circumstances the "confessions" necessarily deserved the closest scrutiny before the jury could determine what portions of each statement it could deem credible beyond a reasonable doubt in determining defendant's guilt. Once an inexperienced factfinding body was told by the State's representative that the judge had found the "confessions" were voluntarily given the harm was done; the jury then could readily infer that defendant had previously contested his "confessions" and the judge found against him.
Defendant had a federal constitutional right to raise the issue of voluntariness before a factfinder other than his trial jury, and if the ruling went against him, not to testify before his trial jury but still place in issue the credibility of his "confessions." Jackson v. Denno, 378 U.S. 368, 691, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). Under our state law he had a right to his trial jury's consideration of the credibility issue unhampered by knowledge of the court's prior voluntariness ruling. The denial of this right, where the defendant's "confessions" were the linchpin of the State's case, was reversible error.

II
Defendant also contends a reversal is required because the trial judge erred in refusing to charge his requested instruction *538 on the elements of larceny. The jury was properly instructed on the elements of robbery. Defendant asserts that the failure to carefully differentiate between the two crimes created the potential for an improper conviction of murder in the first degree if the jury believed that he was not guilty of robbery, but rather only of larceny. Under these facts the jury could have extracted from defendant's two statements and the State's other proofs the theory of a homicide occurring before or after a non-felonious larceny of the credit cards. The taking of the credit cards need not necessarily have been in the course of a robbery under the facts presented here. If no robbery occurred there could be no felony-murder under N.J.S.A. 2A:113-2.
The jury was properly instructed on felony-murder, first degree premeditated murder, second degree murder and manslaughter, as possible homicide verdicts. Thus, the trial court properly recognized that this was not an "all-or-nothing" situation. On the return of the verdict the foreman announced it was based on felony-murder, as opposed to willful, deliberate and premeditated murder.
The jury understandably had problems with the relationship between theft and homicide. The jury retired to deliberate at 10 A.M. At 11:30 A.M. they sent a note to the court expressing concern about the sequence between a possible theft and the alleged homicide. At 12:45 P.M., after consulting counsel, the judge reinstructed the jury in answer to the note as follows:
Now, your question as to number 1, "If the murder or the shot occurred first, and the robbery occurred later, is that a felony murder?" The answer is no.
Two, "If murder is committed in order (Without intent) to commit a robbery afterwards, is that a felony murder?" The answer is yes. Three, "If murder is committed in order (Without intent) to commit a robbery afterwards, is that a felony murder? Answer to that is no.
I will repeat that again so that you understand me. If the murder or the shot occurred first and the robbery occurred later, is that a felony murder? No. If the murder is committed in order *539 with intent to commit a robbery afterwards is that a felony murder? The answer is yes. And if the murder is committed without intent in order to commit a robbery afterwards, is that a felony murder? The answer to that is yes.
Now, of course, at anytime if you feel that it is necessary that I charge you as to any particular aspect or repeat any part of my charge if you think that is necessary, you have the right to ask me and I then have a right to review it and make my determination. You will please go back and resume your deliberations.
The jury retired after this supplemental instruction and returned with the verdict of guilty of murder in the first degree on the theory of felony-murder at 3:15 P.M.
We think the need for a clear instruction on the elements of larceny, as distinguished from robbery, in order to assist the jury with its difficult responsibility was self-evident. If larceny had been described to the jury and they were specifically told that such an offense was not sufficient to support a felony-murder verdict, we would have some certitude that the jury's felony-murder verdict was based on a finding that defendant's conduct, apart from the homicide, constituted robbery. On the state of this record we have no such assurance and find reversible error.

III
Because of the necessity for a retrial one other point raised by defendant must be mentioned. During his direct examination of the victim's daughter the prosecutor asked the reason her father installed a burglar alarm in his house. She replied: "After my step-mother died he felt her family was too familiar with the house and he had a burglar alarm system put in." Defense counsel moved immediately for a mistrial. Out of the jury's presence the trial judge most properly admonished the prosecutor for intentionally asking the question. He then denied the motion and instructed the jury to disregard the question and answer because of the hearsay rule. The question and answer were most improper, especially since the jury knew the defendant was related to the victim and *540 was described in the list found in the victim's basement safe after the homicide. In view of the reversal on other grounds it is not necessary for us to decide if the denial of the motion for mistrial was in these circumstances a mistaken exercise of discretion. We have no doubt however that the potential for prejudice to the defendant inherent in this colloquy was substantial.
Reversed and remanded for new trial.